UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____

Nº 10-CV-2321 (JFB) (WDW)
_____

DANNY JOHNSON,

Plaintiff,

VERSUS

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY
Defendant.

_____

MEMORANDUM AND ORDER
September 16, 2011
_____

JOSEPH F. BIANCO, District Judge:

Plaintiff, Danny Johnson (hereinafter "plaintiff") brings this action, pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("SSA"), challenging the final decision of defendant, Commissioner of the Social Security Administration (hereinafter "Commissioner"), denying the plaintiff's application for Disability Insurance Benefits or Supplemental Security Income. The Commissioner moves for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). Plaintiff opposes the Commissioner's motion and cross-moves for judgment on the pleadings, alleging that the Administrative Law Judge ("ALJ") failed to develop the record and to properly assess plaintiff's credibility and violated the treating physician rule. For the reasons set forth below, the case is remanded to the ALJ for further proceedings consistent with this Memorandum and Order.

I. BACKGROUND

A. Facts

The following summary of facts is based upon the administrative record ("AR") as developed by the ALJ to assess plaintiff's physical and mental state. A more exhaustive recitation of the facts is contained in the parties' submission to the Court and is not repeated herein.

1. Vocational and Other Evidence

Plaintiff was born on May 12, 1963. (AR at 74, 75.) He was educated through the ninth grade. (*Id.* at 124.) He last worked in 2006 as a car detailer and had performed that job

between five and ten years. (*Id*. at 45-46, 121.)[1] He also worked as a landscaper from 1994-1996. (*Id*. at 121.) As a car detailer, his duties included buffing and finishing cars, and spraying the inside. (*Id*. at 45-46, 121.) The job was performed mostly while standing without many opportunities to sit (*id*. at 45-46), and in his disability report, he reported that he would frequently lift up to fifty pounds. (*Id*. at 121.) Plaintiff stated that he lives in his mother's house, along with his mother, his sister and her two sons. (*Id*. at 54-55.) His bedroom is in the basement of his mother's house and he can open the door to his bedroom and walk up and down the stairs. (*Id*. at 66-67.) Although plaintiff sometimes has trouble zipping a zipper or buttoning a shirt, plaintiff is generally independent in his personal care. (*Id*. at 54-56, 62-68, 70.)

2. Medical Evidence

Below, the Court outlines medical evidence of plaintiff's well-being in the period immediately prior to the alleged onset date of January 25, 2007 up until the date of the ALJ's decision.

Plaintiff was treated for human immunodeficiency virus ("HIV") from September 2006 until September 2009 at the Nassau University Medical Center, HIV Primary Care Clinic ("HIV Clinic"). Plaintiff received treatment at the HIV Clinic from Minou Absy, M.D. and nurse practitioner Wanda Evelyn. During that time, plaintiff's illness became more stabilized and his condition generally improved.

a. Treating Source Medical Evidence

Plaintiff was diagnosed with HIV in approximately July 2006. (*Id*. at 185.) Before starting any medications, on September 1, 2006, plaintiff was seen at Nassau University Medical Center ("NUMC") for weakness, nausea, shortness of breath, intermittent chest pain, and exertional dyspnea, but he left without being examined. (*Id*. at 184-85.)

Plaintiff began treatment for HIV on October 11, 2006 at the HIV Clinic. (*Id*. at 186.)[2] Plaintiff's initial medication regiment in October 2006 included Mepron, a prophylaxis for PCP pneumonia; Zithromax, an antibiotic; Mycelex Troches for oral thrush; Dapsone for skin infections; and anti-retroviral medications Combivir, Reyataz and Norvir. (*Id*. at 182.) Plaintiff's lab results showed his CD4 count to be 12 and his viral load to be 14,200.[3] (*Id*. at 183, 187-88.)

---

[1] Plaintiff testified that he was a car detailer for "about five years" (AR at 46.) but his Form SSA-3368, indicates that plaintiff performed that job for approximately ten years from 1997 to January 2007. (*Id*. at 121.)

[2] It indicates on the HIV Clinic intake form that plaintiff had been treated for pneumonia at Mercy Hospital sometime prior to this visit. (*Id*.) The annotation is unclear whether "2 wks" refers to his length of hospitalization or that he was hospitalized two-weeks earlier. (*Id*.) The Mercy Hospital records are not part of the administrative record.

[3] "Viral load measures HIV replication in the body. T-helper lymphocyte ('CD4') cells help the body fight off infection and disease. CD4 cell counts in someone with a healthy immune system range from 500 to 1800. When the CD4 count falls below 200, the person has AIDS. There is usually a correlation between the CD4 count and the viral load; if there is a low CD4 count, then there will be a high viral load. A low baseline viral load is considered 500 or less; a high baseline viral load is over 40,000." *Hall v. Astrue*, No. 06-cv-1000(NGG), 2009 WL 2366891, at *1 n. 1 (E.D.N.Y. July 31, 2009) (quoting *Roman v. Barnhart,* 477 F. Supp. 2d 587, 592 n. 4 (S.D.N.Y. 2007)); *see* 20 C.F.R. § 404, Subpt. P, App.1, 14.00(F)(2) ("Generally, when

Plaintiff weighed 64 kg, had a rash on his face and blurred vision, and did not complain of fever, night sweats, headaches, cough, shortness of breath, swallowing difficulty (dysphagia), weight loss, constipation, diarrhea, or numbness/tingling. (*Id*. at 186.)

On October 26, 2006, plaintiff returned to the HIV Clinic for a follow-up visit. He complained of diarrhea, rash by his eyes and between his legs. (*Id*. at 193.) Also, plaintiff was not taking his HIV medications and was referred to a treatment adherence program. (*Id*. at 194.) Plaintiff's CD4 count and viral load remained at 12 and 14,200. (*Id*. at 193.)[4]

Plaintiff's returned to the HIV Clinic on January 31, 2007. (*Id*. at 197.) He weighed 64.7 kg and complained of a dry cough, visual changes and rash on his legs. (*Id*. at 197.) Plaintiff had not taken his medication for the prior two months due to what he explained were insurance complications and the importance of treatment adherence was stressed. (*Id*. at 197-98.) Plaintiff's CD4 count and viral load remained at 12 and 14,200 and he was considered unstable. (*Id*.)

Plaintiff's medical records from his February 2007 visit to the HIV Clinic indicate a CD4 count of 51 and a dramatically decreased viral load of 222 from his prior 14,200 in January 2007. (*Id*. at 183.) His medical records from April 5, 2007 reveal a CD4 count of 35 and a viral load of less than 75. (*Id*. at 183, 201.)

On April 9, 2007, plaintiff returned to the HIV Clinic and weighed 67.8 kg and complained of a sore throat, cough and slight night sweats. (*Id*. at 160.) His CD4 count was 35 and viral load was 222. (*Id*.) In addition, plaintiff indicated that he was taking his medications and it was noted that he was ninety-percent adherent with his medications. (*Id*. at 160-61, 202.) His physical examination revealed genital warts and he was prescribed a new regimen consisting of Reyataz, Norvir, and Truvada. (*Id*. at 160-61.) Plaintiff was not considered stable. (*Id*. at 161.)

On May 6, 2007, plaintiff was brought to the emergency department of NUMC because he reportedly expressed thoughts of suicide. (*Id*. at 203.)[5] Plaintiff was deemed not suicidal, psychiatrically cleared, and he was given a referral for follow-up by psychiatry. (*Id*. at 204-05.) The following morning, he went to the HIV clinic complaining of increased lethargy, fatigue, weakness, and dizziness. (*Id*. at 208.) Plaintiff explained, as noted *supra* in footnote 5, that he had not taken his medications for a week because he was kicked out of the house after a fight with his ex-girlfriend. (*Id*. at 158.) Plaintiff's CD4 count was 35 and his viral load was less than 75. (*Id*.) Plaintiff's white blood cell (WBC) count and absolute neutrophil (ABN) count had decreased over the past four months necessitating the use of Neupogen and plaintiff was not considered stable. (*Id*. at 208.)

Plaintiff returned to the HIV Clinic for a follow up on May 21, 2007, reporting one episode of night sweats and diarrhea. (*Id*. at 209.) His medical records indicate that he weighed 67.9 kg and he had no adverse reactions to Neupogen after two injections.

---

the CD4 count is below 200 . . . the susceptibility to opportunistic infection is greatly increased.")

[4] Plaintiff was also referred to the ophthalmology clinic at NUMC, was examined on November 1, 2006, and given a prescription for eyeglasses. (*Id*. at 195-96.)

[5] Plaintiff's medical records indicate that he was unable to get his medications because his ex-girlfriend "kicked him out" five days earlier and, thus, he said he wanted to kill himself out of frustration but "[he] did not mean it." (*Id*. at 205.)

3

(*Id.* at 209.) In addition, plaintiff reported that he was one-hundred percent compliant with his medications and refused the treatment adherence program. (*Id.* at 209-210.)

Lab results from August 2007 show that plaintiff's CD4 count was 27 and his viral load was 940 and in October 2007, his CD4 count was 81 and his viral load less than 75. (*Id.* at 183; *see id.* at 156.) On December 13, 2007, plaintiff returned to the HIV Clinic and complained of a slight cough and backache. (*Id.* at 156.) Plaintiff reported that he had not taken his medications for one month and was counseled for treatment adherence. (*Id.* at 156.) Plaintiff weighed 75.6 kg and was deemed stable. (*Id.* at 156-57.)

According to lab results from January 16 2008, plaintiff's blood tests revealed an improved CD4 count of 78 and viral load of 4,763. (*Id.* at 167; *see id.* at 155.) Eight days later, plaintiff went to the HIV Clinic and complained of a cough, dysphagia and visual changes. (*Id.* at 212.) Plaintiff weighed 75.8 kg. (*Id.*) At his annual physical examination conducted during the same visit, plaintiff complained of right hip pain "with long walk." (*Id.* at 154.) The examining doctor noted tenderness in the lower back and plaintiff was diagnosed with right hip pain secondary to aseptic necrotic osteoarthritis. (*Id.* at 154.) Other than genital warts, plaintiff's exam was relatively normal. (*Id.* at 153-55.)[6] The examining doctor noted that plaintiff was "not very compliant" with his medications. (*Id.* at 154.)

On February 14, 2008, x-rays were taken of plaintiff's right hip and found that "[t]here is no evidence of fracture or dislocation . . . and no significant abnormality." (*Id.* at 164, 214, 216.) Later that month, on February 28, 2008, plaintiff returned to the HIV Clinic and complained of a cough and weight loss. Plaintiff weighed 72.6 kg, but he left before being examined. (*Id.* at 217.)

On May 1, 2008, plaintiff returned to the HIV Clinic. (*Id.* at 219.) Plaintiff weighed 72.3 kg and his CD4 count was 134 and viral load of less than 48. (*Id.* at 225, 226.) Plaintiff was noted to have missed four medication doses in the prior week and was seventy-five percent adherent with his medications. (*Id.* at 219, 220.) Medication adherence was stressed and plaintiff refused the treatment adherence program. (*Id.* at 220.)

Plaintiff returned to the HIV Clinic for a follow up on May 29, 2008. (*Id.* at 226.) Plaintiff complained of genital warts and shortness of breath. (*Id.* at 226.) He weighed 73 kg, and it was noted that he was one-hundred percent compliant with his medications, and his condition was deemed stable. (*Id.* at 226, 227.)

As discussed *infra*, on June 16, 2008, Dr. Linnell Skeene conducted a consultative examination at the request of the Commissioner and concluded that plaintiff had no limitation for physical activity based upon the physical examination and noted that plaintiff may have some fatigue secondary to HIV that limits his physical activity. (*Id.* at 172.)

Six weeks later, on July 30, 2008, plaintiff returned to the HIV Clinic. (*Id.* at 172.) Plaintiff complained of hip and left arm pain for the past ten days and shortness of breath. (*Id.* at 228.) His examination revealed genital warts and plaintiff was prescribed Percocet for the hip pain. (*Id.*) Plaintiff weighed 71.7kg and his CD4 count was 153 and his

---

[6] Examination of plaintiff's head, eyes, nose, throat ears were normal, his heart rate was normal with no murmurs and his lungs were clear. (*Id.* at 155.)

4

viral load was less than 48. Plaintiff was prescribed Percocet for the hip pain. (*Id*. at 228, 231.) It was noted that he was one-hundred percent compliant with his medications and he was deemed stable. (*Id.*).

On October 25, 2008, plaintiff returned to the HIV Clinic. (*Id*. at 234.) Plaintiff complained of shortness of breath and weight loss and plaintiff's weight was recorded at 70.2 kg. (*Id*. at 234.) Plaintiff's CD4 count was 181 and his viral load was 646, and he was deemed stable. (*Id*. at 234.) Plaintiff was noted to be eighty-five percent compliant with his medications and refused the treatment adherence program. (*Id*. at 235.) That same day, plaintiff was a walk-in at the NUMC ambulatory unit and he complained of back pain. (*Id*. at 236.) The medical record shows that plaintiff was discharged from jail on Friday, October 10, 2008. (*Id*. at 236.) Plaintiff received a neurological referral to rule out peripheral neuropathy. (*Id*. at 237.)

Lab results from December 16, 2008 show plaintiff's CD4 count to be 169 and his viral load to be 665. (*Id*. at 242.) On December 17, 2008, plaintiff went to the HIV Clinic and complained of night sweats, diarrhea, and visual changes. (*Id*. at 238.) It was noted that plaintiff was 90% complaint with his medications and adherence to treatment was stressed. (*Id*. at 239.) Plaintiff weighed 72.3 kg, he was considered stable, and his medication was not changed. (*Id*. at 239.) Plaintiff reported for an appointment at the NUMC ambulatory unit that same day and reported "no new pain." (*Id*. at 240.)

Plaintiff returned to the HIV Clinic twice in February 2009. (*Id*. at 244-48.) On February 11, 2009, plaintiff complained of a slight cough and constipation, but no pain. (*Id*. at 244, 245.) Plaintiff weighed 71.5 kg and indicated he had stopped his medications several days earlier. (*Id*. at 244.) At his second visit on February 25, 2009, plaintiff indicated that he was "stressed [because] of his girlfriend." (*Id*. at 246.) Plaintiff weighed 72.9 kg. (*Id*. at 246.) Plaintiff stated that he was ninety-percent complaint with his medications and refused the treatment adherence program. (*Id*. at 247.) At his appointment with the NUMC ambulatory unit that same day, plaintiff complained of "body" pain and gave it a severity of three out of ten and described it as "shocks thru body." (*Id*. at 248.)

At plaintiff's March 25, 2009 visit to the HIV Clinic, plaintiff stated he had recently been hospitalized for pneumonia and was "feeling better." (*Id*. at 249.) Plaintiff's lab results from that day show a CD4 count was 304 and his viral load was 753 and he weighed 70.4 kg. (*Id*. at 249, 252.) Plaintiff reported that he was ninety-percent compliant with his medications and he refused treatment adherence counseling. (*Id*. at 250.)

Plaintiff returned to the HIV Clinic on May 28, 2009. (*Id*. at 255.) Plaintiff complained of night sweats, was deemed stable, and weighed 72.7 kg. (*Id*. at 255-56.) Plaintiff reported to be eighty-five percent compliant with his medications. (*Id*. at 256.) At his follow-up with the NUMC ambulatory unit that same day, plaintiff reported no pain. (*Id*. at 258.)

On July 29, 2009, plaintiff returned to the HIV Clinic. (*Id*. at 259.) Plaintiff reported that he had been released from jail the day before his visit after being incarcerated for two months. (*Id*. at 259, 263.) Plaintiff complained of occasional numbness/tingling and weighed 68.9 kg. (*Id*.) His most recent lab results from June 22, 2009 show a CD4 count of 207 and a viral load of less than 48. (*Id*.) Plaintiff reported that he was 100% complaint with his medications. (*Id*. at 260.) That same day, at the NUMC ambulatory

unit, plaintiff complained of flu, but no pain. (*Id*. at 261.) Plaintiff received an ear, nose and throat referral. (*Id*. at 262.)

On August 6, 2009, plaintiff walked-in requesting refills for his medications due to his incarceration. (*Id*. at 264-65.) His scripts were sent to his pharmacy for pick-up the next day. (*Id*. at 265.) On August 27, 2009, plaintiff returned to the HIV Clinic. (*Id*. at 266.) Plaintiff weighed 73.5 kg and reported that he was 100% complaint with his medications. (*Id*. at 266-67.)[7]

### b. Consulting Physician

A little more than two weeks after his latest follow-up visit to the HIV Clinic, Dr. Linell Skeene conducted a consultative internal medicine examination at the behest of the Commissioner on June 16, 2008. (*Id*. at 169-172.) Plaintiff's chief complaint was lower back pain, which he described as sharp and constant, radiating down the right leg without any associative numbness. (*Id*. at 169.)[8] Plaintiff provided his history of HIV, venereal warts, and pneumonia. (*Id*.) Plaintiff indicated that his lower back pain is aggravated with sitting more than an hour, standing for more than fifteen minutes and walking more than a block, and that he gets some relief from Naproxen. (*Id*. at 169.) Plaintiff stated that "[he] is able to shower, bathe, and dress independently . . . and does limited cleaning and laundry" but does not cook or shop. (*Id*. at 170.)[9] Plaintiff weighed 158 lbs. (*Id*.) Dr. Skeene observed:

> The claimant appeared to be in no acute distress. Gait normal. Can walk on heels and toes without difficulty. Squat full. Stance normal. Used no assistive devices. Needed no help changing for exam or getting on and off exam table. Able to rise from chair without difficulty.

(*Id*.)

With respect to plaintiff's musculoskeletal examination, Dr. Skeene observed that plaintiff's "[c]ervical spine shows full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally. No scoliosis, kyphosis, or abnormality in thoracic spine." (*Id*. at 171.) In addition, plaintiff had "full [range of motion] of hips, knees, and ankles bilaterally. Strength 5/5 in upper and lower extremities. . . . Joints stable and nontender. No redness, heat, swelling, or effusion." (*Id*.) Furthermore, Dr. Skeene noted that there were no motor or sensory deficits (*id*.), and plaintiff's "[h]and and finger dexterity intact. Grip strength 5/5 bilaterally." (*Id*. at 171-72.) Finally, Dr. Skeene diagnosed: (1) probable arthritis of the lumbar spine; (2) HIV; (3) status post pneumonia; and (4) venereal warts, and in his medical source statement noted that "the claimant has no limitation for physical activity based on the physical exam. The claimant may have some fatigue secondary to

---

[7] In addition, plaintiff's medical records at this visit and most prior visits indicate that plaintiff is currently sexually active and uses protection. (*Id*. at 266.)

[8] Although Dr. Skeene notes that plaintiff was also seen by him on May 15, 2007, those medical records are not part of the administrative record. In any event, Dr. Skeene notes that plaintiff complained that his lower back pain was worse than when he saw him the prior year. However, Dr. Skeene indicates, as noted below, that plaintiff has had no injections or physical therapy, nor has been under the care of a doctor for his lower back pain or received x-rays of that area. (*Id*. at 169.)

[9] Dr. Skeene also noted that plaintiff was "very vague" regarding his daily consumption of alcohol. (*Id*. at 170.)

HIV that limits his physical activity." (*Id*. at 172.)

### 3. Non-Medical Evidence

#### a. Disability Report

On March 11, 2008, claims representative H. Delia completed a Disability Report, Form SSA-3367, after a face-to face interview with plaintiff. (*Id*. at 115-18.) Within the Observations section, Delia answered that plaintiff has no difficulty with hearing, reading, breathing, understanding, coherency, concentrating, talking, answering, sitting, standing, walking, seeing, using his hands and writing. (*Id*. at 116-17.)[10] In addition, Delia wrote that plaintiff was "[n]ot very helpful with DIB info, just sat in chair and handed forms and memory was not great as far as dates." (*Id*. at 117.)

#### b. Disability Assessment

On July 17, 2008, based upon the medical evidence contained in the record at that time, including Dr. Skeene's consultative examination, disability analyst A. Tolliver completed a Physical Residual Functional Capacity Assessment ("disability assessment") of plaintiff. (*Id*. at 173-78.)[11] In the disability assessment, Tolliver indicated that plaintiff could lift ten pounds, "Stand and/or walk" for six hours in an eight hour workday or sit for six hours during that same time. (*Id*. at 174.) In addition, Tolliver indicated that plaintiff had no limitation with respect to his ability to "[p]ush and/or pull." (*Id*. at 174.) To support the conclusions, Tolliver wrote:

> Claimant is a 45 year old male diagnosed with HIV, probable back pain. On current medical exam claimant had normal gait, would walk on heels and toes without difficulty. Claimant had full extension and flexion of LS spine and hips. Full ROM of motion of knees, ankles. No swelling or effusion.

(*Id*. at 174.)

In addition, Tolliver stated that his findings were not significantly different from the treating source conclusions. (*Id*. at 177.)

#### c. Testimonial Evidence

Plaintiff was forty-six years old at the time he testified at his hearing on October 14, 2009. (*Id*. at 45.) As noted *supra*, plaintiff had worked as a car detailer and stopped working in 2006. (*Id*. at 45-46.) He performed the job mostly while standing and he stopped working because he found out he had HIV and he could not stand for very long due to a back problem, which he identified as scoliosis. (*Id*. at 46-47; *see Id*. at 50.) Plaintiff elaborated further that he was laid off due to his HIV medical appointments. (*Id*. at 48.) ("I kept having to go to my appointments

---

[10] The Observations section allows the interviewer to answer "Not observed/perceived," rather than no. (*Id*. at 116-17.)

[11] Under 20 C.F.R. § 404.1513(a), disability analysts are not considered acceptable medical sources and their non-medical opinions should not be given significant weight in the RFC assessment. Here, it is undisputed that the ALJ, in his decision, inaccurately classified A. Tolliver as a State Agency medical consultant and considered the disability assessment as medical evidence. (*See* Comm'r's Mem. of Law at 22-23.) As discussed *infra*, although this error is not necessarily a basis for remand in every case, the Court is remanding the case on other grounds and, thus, on remand, the ALJ should also reconsider the disability assessment in accordance with the applicable regulations.

. . . and they couldn't have me going to my appointments because I had to do cars so they laid me off.") Responding to a question about whether he has tried to go back to work, plaintiff explained "I tried but the appointments just got in the way so I told them about it and some of the people just can't use me." (*Id*. at 48-49.)

With respect to his back problem, plaintiff testified that he never had surgery on his back and has not had any injections. (*Id*. at 56, 68.) Plaintiff was wearing a back brace at the hearing and also testified that he sometimes uses a cane. (*Id*. at 52.) He explained that he started using the back brace about three months before the hearing and it made him "feel better." (*Id*. at 52-53.) Neither the back brace nor cane were prescribed by a doctor and plaintiff decided to get them on his own. (*Id*. at 53, 59.) Plaintiff stated that he had some pain sitting at the hearing but that it is not bad until he stands up. (*Id*. at 69.)

With respect to HIV, plaintiff testified that his primary symptoms were feeling weak and tired and difficulty sleeping. (*Id*. at 51.) Plaintiff also stated that he sometimes had "night sweats" and when that occurred sleeping without his t-shirt stops the sweating. (*Id*. at 61.) In addition, plaintiff testified that he has trouble concentrating and sometimes he forgets things such as his appointments. (*Id*. at 60.)

Plaintiff testified that he lives with his mother, his sister and his two nephews, ages ten and eighteen. (*Id*. at 54-55.) As noted *supra*, although plaintiff testified that he sometimes has trouble zipping a zipper or buttoning a shirt (*id*. at 63-64), plaintiff is generally independent in his personal care. He lives in the bedroom in the basement of his mother's house and he can open the door to his bedroom and walk up and down the stairs. (*Id*. at 66-67.) When plaintiff wakes up in the morning, he first stretches and then washes and brushes his teeth. (*Id*. at 55.) He is able to open a drawer to take something out and open a closet to take out clothes. (*Id*. at 67.) It takes plaintiff about twenty minutes to dress himself and longer if he has to tie shoes. (*Id*. at 70.) Plaintiff is able to open an envelope, write with a pen, shower, get a haircut, pull a t-shirt over his head, use utensils, use a phone, hold up a cup of coffee, pick up coins, and squeeze a tube of toothpaste. (*Id*. at 62, 66-68.) Plaintiff goes shopping for food with his mother (*id*. at 64; *see id*. at 130), but otherwise most other household chores are performed by his mother or friend. (*Id*. at 64-66.)

B. Procedural History

On March 11, 2008, plaintiff filed applications for disability insurance benefits and supplemental security income, alleging disability beginning January 25, 2007 due to HIV and lower back problems. (*Id*. at 102-106, 120.) The applications were denied on July 28, 2008. (*Id*. at 76.) On October 23, 2008, plaintiff requested a hearing (*id*. at 83), and appeared with his representative before ALJ Seymour Rayner on October 14, 2009. (*Id*. at 42.) By decision dated November 16, 2009, ALJ Rayner found that plaintiff was not disabled. (*Id*. at 32-40.) Plaintiff then filed a timely appeal to the Appeals Council, which was denied on March 19, 2010. (*Id*. at 1-3.) Plaintiff then filed this action on May 21, 2010, and the Commissioner served the administrative record on September 21, 2010, and filed his answer on September 22, 2010. On February 25, 2011, the parties bundled their papers: Commissioner moved the Court for a judgment on the pleadings and plaintiff responded and cross-moved for a judgment on the pleadings; Commissioner replied and plaintiff submitted a reply on his cross-motion. The motions are fully submitted and the Court has carefully considered the parties' arguments.

8

## II. DISCUSSION

### A. Standard of Review

A district court may only set aside a determination by an ALJ that is based upon legal error or that is unsupported by substantial evidence. *Balsamo v. Chater,* 142 F.3d 75, 79 (2d Cir. 1998) (citing *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir. 1982)). The Supreme Court has defined "substantial evidence" in Social Security cases as "more than a mere scintilla" and that which "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 3 89, 401 (1971) (quoting *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)); *see also Quinones v. Chater,* 117 F.3d 29, 33 (2d Cir. 1997) (adopting the Supreme Court's definition in *Richardson* of "substantial evidence"). Furthermore, "[i]t is up to the agency, and not th[e] court, to weigh the conflicting evidence in the record." *Clark v.. Comm'r of Soc. Sec.,* 143 F.3d 115, 118 (2d Cir. 1998). If the court finds that there is substantial evidence to support the Commissioner's determination, the decision must be upheld, even if there is substantial evidence for the plaintiff's position. *See, e.g., Yancey v. Apfel,* 145 F.3d 106, 111 (2d Cir. 1998); *Jones v. Sullivan,* 949 F.2d 57, 59 (2d Cir. 1991). "Where an administrative decision rests on adequate findings sustained by evidence having rational probative force, the court should not substitute its judgment for that of the Commissioner." *Yancey,* 145 F.3d at 111; *see also Jones,* 949 F.2d at 59 ("[T]he court may not substitute its own judgment for that of the Secretary, even if it might justifiably have reached a different result upon a *de novo* review." (quoting *Valente v. Sec'y of Health and Human Servs.,* 733 F.2d 1037, 1041 (2d Cir. 1984))).

### B. The Disability Determination

A claimant is entitled to Social Security benefits under the Social Security Act ("SSA") if the claimant is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §1382c(a)(3)(A). An individual's physical or mental impairment is not disabling under the SSA unless it is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education ,and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §1382c(a)(3)(B).

The Commissioner has promulgated regulations establishing a five-step procedure for evaluating disability claims. *See* 20 C.F.R. §§ 404.1520, 416.920. The Second Circuit has repeatedly summarized this evaluative process:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the

[Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work.

*Brown v. Aphel*, 174 F.3d 59, 62 (2d Cir. 1999) (quoting *Perez v. Chater*, 77 F. 3d 41, 46 (2d Cir. 1996)). The claimant bears the burden of proof with regard to the first four steps; the Commissioner bears the burden of proving the last step. *Brown*, 147 F.3d at 62.

The Commissioner "must consider" the following in determining a claimant's entitlement to benefits: "(1) objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; (4) the claimant's educational background, age, and work experience." *Id.* (citing *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam)).

Here, in reaching his conclusion that plaintiff was not disabled under the SSA, the ALJ adhered to the five-step sequential analysis for evaluating applications for disability benefits. (*Id*. at 35-40.) At the first step, the ALJ found that plaintiff had not engaged in substantial gainful activity since his alleged disability onset date of January 25, 2007. (*Id*. at 36.) At step two of the analysis, the ALJ found that plaintiff had severe impairment consisting of "a lumbar spine sprain/strain which results in pain in the lower back." (*Id*. at 36.) Although the ALJ did not explicitly find plaintiff's HIV to be a severe impairment, the ALJ considered plaintiff's HIV at steps three and four of the inquiry. In other words, if plaintiff's HIV was not a severe impairment under step two, that would end the ALJ's inquiry with respect to plaintiff's HIV and there would be no need for the ALJ to proceed to determine whether it is a listed impairment under step three and whether plaintiff possesses the residual functional capacity to perform her past relevant work under step four. Thus, the Court concludes that the ALJ found plaintiff's HIV to be a severe impairment and its absence from the decision is an inadvertent typographical error.[12] At step three of the analysis, the ALJ determined that plaintiff did not have an impairment or combination of impairments that "meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926)." (AR at 36.) With respect to plaintiff's back impairment, the ALJ noted that there was "no evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine and muscle spasm with motor loss accompanied by sensory or reflex loss" as required by Section 1.04 of the regulations to demonstrate a spinal disorder. (*Id*. at 36.) With respect to plaintiff's HIV, the ALJ found that there was "no evidence of the bacterial, fungal, protozoan, helminthic or viral infections . . . or HIV wasting syndrome;

---

[12] Furthermore, because the ALJ considered plaintiff's HIV at steps three and four of the analysis, the Commissioner concedes that the ALJ found plaintiff's HIV to be a severe impairment. (*See* Comm'r's Mem. of Law at 17.) In any event, on remand (for the other reasons stated herein), in an abundance of caution, the Court directs the ALJ to confirm whether he found plaintiff's HIV to be a severe impairment.

persisting diarrhea or repeated manifestations of HIV infection required by Section 14.08A.-K in Appendix 1 to Subpart P, Part 404 of the Regulations." (*Id.* at 36-37.) In addition, the ALJ noted that plaintiff was hospitalized for pneumonia "on one occasion [and] Section 14.08J.3 requires that the pneumonia be resistant to treatment or require hospitalization or intravenous treatment 3 or more times in 1 year." (*Id.* at 37.) In the fourth and fifth steps of his analysis, after considering the entire record and evidence, the ALJ concluded that plaintiff was able to perform his past relevant work as a car detailer (*id.* at 39-40), and even if unable to perform that past relevant work, plaintiff was not disabled because plaintiff had the residual functional capacity to perform "a full range of light work and based upon his younger age, a limited ninth grade education and a history of semiskilled work with no transferrable skills [pursuant to] Rule 202.19 in Appendix 2." (*Id.* at 40.) The ALJ specifically relied upon the consultative examination by Dr. Skeene "supplemented by an assessment consistent with both sedentary and light work by A. Tolliver, a State Agency medical consultant." (*Id.* at 37.)[13]

### C. Duty to Develop the Record

Plaintiff argues that the ALJ failed to develop the record. Specifically, plaintiff argues that the ALJ failed to obtain RFC assessments from NUMC treating physician and treating nurse practitioner, Minou Absy, M.D. and Wanda Evelyn ("treating sources"), respectively.[14] For the reasons set forth below, after a thorough and careful examination of the administrative record in this case under the deferential standard applicable to Social Security appeals, the Court concludes that the ALJ failed to fully develop the record in accordance with the applicable regulations. Specifically, because the ALJ did not *request* any of the treating sources to opine on plaintiff's RFC, remand is required.

It is well-established that the ALJ must affirmatively "develop the record in light of the essentially non-adversarial nature of a benefits proceeding" *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999) (quoting *Pratts v. Chater,* 94 F.3d 34, 37 (2d Cir. 1996)). The ALJ's regulatory obligation to develop the administrative record exists even when the claimant is represented by counsel or by a paralegal at the hearing. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999); *Pratts,* 94 F.3d at 37. The regulations provide that the lack of a statement from plaintiff's treating source regarding how plaintiff's impairments affect his or her ability to perform work-related activities will not render a report incomplete. 20 C.F.R. § 404.1513(b)(6). However, the regulations also provide that the Commissioner will first request such a statement. *See Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) ("[B]efore we make a determination that you are not disabled, we will develop your complete medical history . . . [and] will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request the reports." (quoting 20 C.F.R. § 404.1512(d))); *see also Robins v. Astrue*, No. CV–10–3281 (FB), 2011 WL 2446371, at *3 (E.D.N.Y. June 15, 2011) ("Although the regulation provides that the lack of such a statement will not render a report incomplete, it nevertheless promises that the Commissioner will request one.").

---

[13] *See* footnote 11.

[14] Because "nurse-practitioners" are considered "other" medical sources to show how plaintiff's impairments affect his ability to perform work-related activities (§ 404.1513(d)), the Court will refer to Dr. Absy and nurse Evelyn as plaintiff's "treating sources."

11

Here, as noted above, the Court conducted a thorough and careful review of the administrative record. The record contains over one-hundred pages of well documented medical source documents from NUMC and its HIV Clinic over a three-year period from September 2006 until September 2009 (AR at 153-68, 182-270), exceeding the regulations' requirements for a complete medical history under 20 C.F.R. § 416.912(d). In addition, the record includes a report from consultative examiner, Dr. Skeene, disability analyst A. Tolliver, and plaintiff's detailed testimony at the hearing, regarding his functional capacity. However, there is no reference in the decision or the record as a whole that the ALJ requested RFC assessments from plaintiff's treating sources.

The Commissioner contends that the medical records obtained were sufficient to make a disability determination. (*See* Comm'r's Reply at 2 (*citing Rosa v. Callahan,* 68 F.3d at 79 n. 5 ("[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim."))). However, as stated above, the Commissioner's regulations explicitly state otherwise. *Robins*, 2011 WL 2446371, at *3 ("Although the regulation provides that the lack of such a statement will not render a report incomplete, it nevertheless promises that the Commissioner will request one."). First, § 404.1512(d) provides "[w]e will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request the reports." *Id*; *see also Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996). Second, "§ 404.1513(b)(6) states that a treating source's medical report should include '[a] statement about what [the claimant] can still do despite [his or her] impairment(s).'" *Robins*, 2011 WL 2446371, at *3. Finally, "Social Security Ruling 96–5p confirms that the Commissioner interprets those regulations to mean that '[a]djudicators are generally required to request that acceptable medical sources provide these statements with their medical reports.'" *Id*. (internal citations omitted). In other words, the Commissioner has an affirmative duty to request RFC assessments from plaintiff's treating sources despite what is otherwise a complete medical history. *See id*. at *2-4 (although the ALJ considered plaintiff's hospital and treatment records, which encompassed a five-year period, plaintiff's hearing testimony and the assessment of a consultative physician who examined plaintiff at the Commissioner's request, the Court remanded because the ALJ did not attempt to obtain medical opinions from plaintiff's treating physicians); *see also Clark v. Astrue*, 08 Civ. 10389(LBS), 2010 WL 3036489, *6 n. 5 (S.D.N.Y. August 4, 2010) ("In this case, the administrative transcript does not contain any statements from any of plaintiff's treating sources regarding how plaintiff's impairments affect her ability to perform work-related activities. The ALJ had nothing more than treatment records from Ellis Hospital Mental Health and consultative reports to review. Thus, the ALJ had an affirmative duty, even if plaintiff was represented by counsel, to develop the medical record and request that plaintiff's treating physicians assess plaintiff's functional capacity. The ALJ's failure to seek medical evaluations from plaintiff's treating sources and to apply the proper standard to assess plaintiff's ability to meet the mental demands of work, deprived plaintiff of a full hearing." (quoting *Dickson v. Astrue,* No. 1:06-CV-0511 (NAM/GHL), 2008 WL 4287389, at *13 (N.D.N.Y. Sept. 17, 2008))); *cf. Streeter v. Comm'r of Soc. Sec.*, No. 5:07-CV-858 (FJS), 2011 WL 1576959, at * 4 (N.D.N.Y. April 26, 2011) ("Although

Plaintiff correctly notes that the record lacks a medical source statement from her treating physician, the ALJ made reasonable efforts to obtain such a record. The ALJ sent a letter to Plaintiff's counsel prior to the hearing, advising him about how to obtain Plaintiff's medical records, including medical opinions. In that letter, the ALJ asked counsel to provide him, along with other medical records, with a fully completed Medical Assessment from the physician most familiar with the claimant's impairments; to make a second request if counsel did not receive a medical sources statement; and, if Plaintiff's counsel did not receive the requested information within thirty days of the initial request, to send the ALJ a copy of his letter to Plaintiff's treating source and to contact the ALJ's office immediately so that the ALJ could request the information. In a letter dated May 13, 2005, Plaintiff's counsel sent a request to Plaintiff's treating physician, asking for Plaintiff's complete medical records as well as an opinion about whether Plaintiff was disabled. In addition to his letter to Plaintiff's counsel prior to the hearing, the ALJ specifically asked Plaintiff's counsel, during the hearing, if the medical records were complete, to which Plaintiff's counsel responded affirmatively. . . . Thus, the Court finds that the ALJ met his duty to develop the record completely and to ensure that he had a complete medical record." (internal quotations and citations omitted)). Thus, remand is appropriate in this case. Accordingly, upon remand, the ALJ must request RFC assessments from plaintiff's treating sources.[15]

because it was not supported by the objective medical evidence. (AR at 39.) The Court recognizes that "[i]t is the function of the Secretary, not the reviewing courts, to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Aponte v. Sec'y Dep't of Health & Human Servs.,* 728 F.2d 588, 591 (2d Cir. 1984) (internal citations and quotations omitted). With respect to plaintiff's argument that the ALJ violated the treating physician rule, plaintiff specifically argues that the ALJ improperly disregarded treating source evidence and, thus, the ALJ erred in finding that plaintiff did not meet or equal the regulations listing for HIV, and that the ALJ erred in considering the disability analyst's assessment as medical evidence. (*See* Pl.'s Mem. of Law at 11-14.) As noted *supra*, it is undisputed that the disability analyst was classified as a State Agency medical consultant rather than a disability analyst and the disability assessment was considered medical evidence. As an initial matter, the Court notes that this error is not necessarily a basis for remand in every case. *See Napierala v. Astrue*, No. 07-CV-0706, 2009 WL 4892319, at *6 (W.D.N.Y. Dec. 11, 2009) (holding that although improperly assigned "significant weight" of the disability analyst's assessment, there was substantial evidence in the record to support the ALJ's determination of plaintiff's RFC); *see also Davies v. Astrue*, No. 08-CV-0115 (GLS), 2010 WL 2777063, at *7 (N.D.N.Y. June 17, 2010) (finding that ALJ's RFC determination was supported by substantial evidence because the ALJ relied on the opinion of a consultative examiner as well as the disability analyst). However, since the Court is remanding the case for failure to fully develop the record on the grounds discussed *supra,* the ALJ on remand should also properly consider the disability analyst as a non-medical source (rather than a medical source), in light of any additional information he receives from plaintiff's treating sources, and the other evidence already before him (including plaintiff's testimony). In sum, on remand, the ALJ should re-evaluate the evidence after requesting RFC assessments from plaintiff's treating sources, in accordance with this Memorandum and Order, and the ALJ should also consider whether that re-evaluation alters his

---

[15] Plaintiff also contends that the ALJ failed to properly assess plaintiff's credibility and violated the treating physician rule. With respect to plaintiff's argument that the ALJ erred in assessing plaintiff's credibility, the Court notes that the ALJ concluded that plaintiff's testimony "concerning the intensity, persistence and limiting effects" of his impairments was not credible

### III. CONCLUSION

For the reasons set forth above, the case is remanded to the ALJ for further proceedings consistent with this Memorandum and Order. Specifically, on remand, the ALJ must request RFC assessments from plaintiff's treating sources. Then, the ALJ must reassess plaintiff's RFC taking into account any RFC assessments provided in response to his request, in accordance with the applicable regulations. In addition, as discussed *supra*, the ALJ should also consider whether his reevaluation of the evidence alters his assessment of plaintiff's credibility and his finding that plaintiff did not meet or equal the regulations listing for HIV. Furthermore, to the extent that the ALJ relies upon the disability analyst's assessment, the ALJ should reconsider it in accordance with the applicable regulations. Finally, as noted *supra*, it appears the ALJ made an inadvertent typographical error as to whether plaintiff's HIV was found to be a severe impairment. Thus, in an abundance of caution, on remand, the Court directs the ALJ to confirm that plaintiff's HIV was found to be a severe impairment. The Commissioner shall take all steps necessary to prevent any delay in the processing of plaintiff's case and in conducting further proceedings before the ALJ. *See Butts v. Barnhart*, 388 F.3d 377, 387 (2d Cir. 2004).

---

assessment of plaintiff's credibility and his finding that plaintiff did not meet or equal the regulations listing for HIV. Furthermore, after evaluating the evidence as a whole, to the extent that the ALJ relies upon the disability analyst's assessment, the ALJ should reconsider it in accordance with the applicable regulations.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Date: September 16, 2011
      Central Islip, NY

\* \* \*

The attorney for plaintiff is Darlene Rosch, Esq., Nassau/Suffolk Law Services Committee, Inc., 1757 Veterans Highway, Suite 50, Islandia, NY 11749. The attorney for defendant is Loretta E. Lynch, United States Attorney, Eastern District of New York, by Arthur Swerdloff, Assistant United States Attorney, 271 Cadman Plaza, 7th Floor, Brooklyn, NY 11201.